Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| Karla Ivelisse Catinchi Rinaldi

**Apelante**

V.

Metro Caguas Incorporated y Otros

**Apelados** | TA2026AP00476 | *APELACIÓN* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan

Civil. Núm. SA2024CV05886

Sobre: Ley de Represalia en el Empleo (Ley Núm. 115-1991) y Otros |

Panel integrado por su presidente, el Juez Hernández Sánchez, el Juez Rivera Torres y el Juez Marrero Guerrero.

**Hernández Sánchez, Juez Ponente**

**SENTENCIA**

En San Juan, Puerto Rico, a 4 de junio de 2026.

El 8 de mayo de 2026, la Sra. Karla I. Catinchi Rinaldi (señora Catinchi o la apelante) compareció ante nos mediante *Apelación* y solicitó la revisión de una *Sentencia* que se dictó el 26 de abril de 2026 y se notificó el 28 de abril de 2026 por el Tribunal de Primera Instancia, Sala Superior de San Juan (TPI). Mediante el aludido dictamen, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó Metro Caguas Incorporated (Metro Caguas o la apelada) y, por consiguiente, determinó que el despido de la señora Catinchi fue justificado. En vista de lo anterior, desestimó la *Querella* que presentó la apelante y ordenó el cierre y archivo del caso.

Por los fundamentos que expondremos a continuación, **confirmamos** el dictamen apelado.

I.

El 26 de junio de 2024, la señora Catinchi presentó una *Querella* sobre represalias, ley de pagos de salarios e incumplimiento

de contrato de empleo al amparo del procedimiento sumario de la de Ley Núm. 2 de 17 de octubre de 1961, según enmendada, mejor conocida como *Ley de Procedimiento* Sumario de Reclamaciones Laborales, 32 LPRA sec. 3120 (Ley Núm. 2), contra Metro Caguas y otros demandados desconocidos.[1] Alegó que comenzó a trabajar en enero de 2019 para el Hospital HIMA San Pablo Bayamón como farmacéutica Pharm.D. Sostuvo que, posteriormente, fue promovida a Gerente (Farmacéutica Regente) de la Farmacia Clínica de HIMA San Pablo Cupey y luego pasó a ocupar el puesto de Directora Auxiliar de Farmacia para varios hospitales del conglomerado. Indicó que, a partir del 1 de junio de 2023 asumió la regencia de la Farmacia Clínica de HIMA San Pablo Caguas, supervisando cuarenta y siete (47) empleados.

Expresó que, tras anunciarse la quiebra del conglomerado HIMA San Pablo y la adquisición de HIMA San Pablo Caguas por Metro Caguas (Hospital Pavía), trabajó extensamente en el proceso de transición asistiendo a la farmacéutica corporativa de Metro Caguas en asuntos relacionados con licencias, traspaso de medicamentos controlados, migración de documentos, inventarios, orientación al personal y otras tareas operacionales y administrativas.

Adujo que, el 18 de diciembre de 2023, Metro Caguas le entregó una Oferta de Empleo Condicionada para ocupar el puesto de Directora del Departamento de Farmacia con salario anual de $120,000.00 y con el beneficio de que el patrono cubriría el 100% del plan médico individual. Alegó que aceptó dicha oferta y continuó trabajando desde el 20 de diciembre de 2023, desempeñando esencialmente las mismas funciones que ejercía antes de la compra del hospital. Además, sostuvo que durante el proceso de transición

---

[1] *Véase*, Entrada Núm. 1, SUMAC TPI.

se le informó que los empleados retenidos no estarían sujetos a período probatorio y que nunca se mencionó tal condición en la oferta de empleo. Asimismo, expresó que en varias ocasiones solicitó la descripción de su puesto y las de sus empleados supervisados, pero nunca le fueron entregadas.

Esbozó que, en enero de 2024, durante el proceso de inscripción al plan médico, la apelada le informó que debía aportar $47.93 bisemanales al costo del plan médico, a pesar de que la oferta de empleo disponía que el patrono cubriría el 100% del costo del plan individual. Alegó que autorizó las deducciones correspondientes. Por otro lado, sostuvo que el 16 de enero de 2024 fue citada al Departamento de Recursos Humanos para completar documentos de nombramiento y que allí fue obligada a firmar una hoja adicional indicando que estaría en período probatorio por seis (6) meses, sin permitírsele obtener copia o fotografía del documento.

Manifestó que, el 1 de marzo de 2024 fue citada nuevamente a Recursos Humanos, donde se le informó que existía un supuesto error en las tarifas del plan médico notificadas previamente a los empleados y que el patrono realizaría deducciones retroactivas para recuperar cantidades no descontadas durante enero y febrero de 2024. Según alegó, en su caso se descontarían $28.40 durante las próximas tres nóminas. Sostuvo que, ese mismo día, a saber, el 1 de marzo de 2024, envió un correo electrónico a la Directora de Recursos Humanos indicando que la deducción propuesta era contraria a la Ley Núm. 17 de 17 de abril de 1931, según enmendada, conocida como la *Ley de Pago de Salarios*, 29 LPRA sec. 171 *et seq.* (Ley Núm.17-1931) y que no consentía a que se le descontaran dichas cantidades de su salario. Además, adujo que notificó que la medida había causado desánimo entre los empleados de su departamento.

Expresó que, el lunes 4 de marzo de 2024 fue citada nuevamente a Recursos Humanos y, en presencia de la Directora de Recursos Humanos y el Director Ejecutivo del hospital, se le notificó su despido mediante carta indicando que no había aprobado el período probatorio. Alegó que la apelada posteriormente descontó del cheque de liquidación la suma total de $85.20 correspondiente a las alegadas diferencias del plan médico. Indicó que trabajó setenta y cinco (75) días para la apelada, que se desempeñó de manera eficiente y satisfactoria, que nunca fue amonestada verbal ni por escrito, que nunca recibió manual del empleado ni normas o políticas aplicables, y que la apelada se benefició de su conocimiento sobre las operaciones del hospital durante la transición.

Además, alegó que fue despedida menos de veinte cuatro (24) horas laborables después de haber denunciado y objetado la práctica de descontar de su salario cantidades relacionadas con el supuesto error en las tarifas del plan médico. Sostuvo que el despido constituyó una represalia en violación a la Ley Núm. 115 de 20 de diciembre de 1991, según enmendada, conocida como *Ley de Represalias contra el Empleado por Ofrecer Testimonio*, 29 LPRA sec. 194 *et seq.* (Ley Núm.115-1991), y que estableció un caso *prima facie* bajo dicha ley. También argumentó que la apelada no contaba con una razón legítima y no discriminatoria para despedirla.

En virtud de lo anterior, reclamó represalias al amparo de la Ley 115-1991, *supra*, e incumplimiento de contrato de empleo y violación a la Ley Núm. 17-1931, *supra*. Alegó que sufrió angustias mentales estimadas en no menos de $150,000.00, salarios y beneficios dejados de percibir estimados en no menos de $10,000.00 mensuales, y reclamó además la devolución de $85.20 descontados sin autorización. Además, solicitó que las cantidades reclamadas fueran duplicadas conforme a las leyes aplicables, así como costas y honorarios de abogado.

En respuesta, el 17 de julio de 2024, Metro Caguas presentó su *Contestación a Querella*.[2] En esencia, negó la mayoría de las alegaciones de la apelante y admitió únicamente determinados hechos relacionados con la adquisición del Hospital HIMA San Pablo Caguas, la oferta de empleo extendida a la apelante y ciertas comunicaciones sobre el plan médico y el despido. Particularmente, alegó que, durante noviembre y diciembre de 2023, se anunció públicamente que Metro Caguas adquirió el Hospital HIMA San Pablo mediante subasta y que el cierre de la compraventa se proyectaba para diciembre de 2023. Reconoció que la apelante asistió a la Directora de Farmacia Corporativa, Lcda. Mabel Machado (licenciada Machado), durante el proceso de transición en varias tareas operacionales y administrativas.

Además, admitió que el 18 de diciembre de 2023 se le extendió a la señora Catinchi una Oferta de Empleo Condicionada y que el anejo de dicha oferta indicaba una aportación patronal del 100% al plan médico individual. Sin embargo, alegó afirmativamente que dicha información fue incluida por error e inobservancia y que la determinación del Hospital siempre fue que los empleados aportarían un porciento del costo del plan médico conforme al Plan de Salud Grupal. Además, planteó que el error no creó derechos u obligaciones contractuales.

Por otro lado, negó que la apelante permaneciera en el mismo puesto sin período probatorio y sostuvo que esta última comenzó a ocupar el puesto de Directora del Departamento de Farmacia el 20 de diciembre de 2023 mediante un nombramiento probatorio. Indicó que todos los empleados contratados por el Hospital estarían sujetos a período probatorio y que, conforme a la Ley Núm. 80-1976, según enmendada por la Ley Núm. 4-2017, el período probatorio era

---

[2] *Véase*, Entrada Núm. 8, SUMAC TPI.

automático para empleados exentos. Sostuvo que la señora Catinchi firmó voluntariamente un Nombramiento Probatorio el 16 de enero de 2024, mediante el cual se le informó que estaría sujeta a un período probatorio de seis (6) meses.

Asimismo, negó que la apelante hubiese solicitado descripciones de deberes y expresó que, durante los primeros meses de operación y transición, aún no se habían creado dichas descripciones, aunque esta última conocía las funciones y expectativas de su puesto. Además, sostuvo que informó a la señora Catinchi que las tarifas originalmente notificadas del plan médico eran incorrectas y que debían ser mayores. Esbozó que la apelante autorizó las deducciones correspondientes a su aportación al plan médico y que no era necesario su consentimiento para corregir las deducciones relacionadas con las primas del plan médico. También señaló que la Ley Núm. 17-1931, *supra*, no aplicaba a empleados exentos, como, a su entender, era la apelante.

En cuanto al correo electrónico enviado por la señora Catinchi el 1 de marzo de 2024, únicamente admitió que dicho correo fue enviado, pero negó la veracidad de las alegaciones allí contenidas. Alegó afirmativamente que el Hospital no violó la Ley Núm. 17-1931, *supra*, y que dicha ley aplicaba únicamente a empleados no exentos. Admitió que la apelante fue citada a una reunión el 4 de marzo de 2024 y que allí se le notificó el despido por no aprobar el período probatorio. Sin embargo, negó que el despido fuese una represalia. Sostuvo que la decisión de no aprobar el período probatorio de la señora Catinchi fue tomada antes del correo electrónico enviado el 1 de marzo de 2024. Indicó que el Director Ejecutivo, Lcdo. Juan C. Marcial (licenciado Marcial), tomó dicha decisión el 29 de febrero de 2024 y solicitó los reportes de ponches de la apelante para documentar incumplimientos relacionados con el horario de trabajo.

Esbozó que, desde el comienzo de su empleo, la señora Catinchi incumplió con el horario requerido de entrada a las 9:00 a.m., llegando regularmente después de las 10:00 a.m. Alegó que la apelante indicó a la licenciada Machado que ella era productiva luego de las 11:00 a.m. y que nunca informó durante el reclutamiento que no podía trabajar antes de las 10:00a.m. u 11:00 a.m. Además, planteó que la apelante incurrió en insubordinación al negarse a cumplir instrucciones relacionadas con el horario de trabajo, que llegó tarde a reuniones convocadas por el Director Ejecutivo y que se dirigió de forma inapropiada hacia la licenciada Machado. También señaló que las tardanzas de la señora Catinchi afectaban la operación de la farmacia y obligaban al personal supervisado a realizar tareas que le correspondían a ella.

Expresó que, la Sra. Margie Rosario Lugo (señora Rosario) se reunió con la apelante el 25 de enero y el 29 de febrero de 2024 para exigirle cumplimiento con el horario de trabajo y reiterarle que debía entrar a las 9:00 a.m., pero que esta última continuó incumpliendo. Indicó que la conducta de la señora Catinchi reflejaba una actitud retante, desafiante e insubordinada. Expresó que la decisión de despedir a la apelante respondió exclusivamente al interés legítimo del Hospital de preservar la adecuada marcha de las operaciones y el bienestar de pacientes y empleados. Aseguró que no existía nexo causal entre el correo electrónico del 1 de marzo de 2024 y el despido, por lo que la reclamación de represalias era cronológicamente imposible e inmeritoria.

En cuanto a los daños reclamados, negó que la señora Catinchi hubiese sufrido daños compensables y alegó que los daños reclamados eran ficticios, exagerados, especulativos y dirigidos al enriquecimiento injusto. Además, indicó que, de existir daños, estos serían auto infligidos o causados por terceros. Respecto a la causa de acción por incumplimiento contractual y violación a la Ley Núm.

17-1931, *supra*, alegó que la señora Catinchi era una empleada exenta y que, por lo tanto, dicha ley no le aplicaba. Además, argumentó que no existió incumplimiento contractual alguno, ya que la apelante consintió a los términos y condiciones de empleo y que el Hospital cumplió con todas sus obligaciones.

Luego de varios tramites procesales, incluyendo la culminación del descubrimiento de prueba, el 4 de marzo de 2025, Metro Caguas presentó una *Moción de Sentencia Sumaria*.[3] En primer lugar, expuso los hechos que, a su juicio, no estaban en controversia. Luego argumentó que procedía la desestimación total y con perjuicio de la *Querella* presentada por la señora Catinchi. En síntesis, alegó que no existían controversias materiales de hechos y que la apelante no podía sostener sus causas de acción bajo la Ley Núm. 115-1991, *supra*, la Ley Núm. 17-1931, *supra*, ni su reclamación por alegado incumplimiento contractual.

Específicamente, en cuanto a la reclamación de represalias bajo la Ley Núm. 115-1991, *supra*, esbozó que la apelante sostuvo que fue despedida en represalia por haber enviado un correo electrónico el 1 de marzo de 2024 a las 4:37 p.m., el cual identificaba como la única actividad protegida invocada en la *Querella*. Sin embargo, expresó que la decisión de no aprobar el período probatorio y terminar el empleo de la apelante fue tomada durante la mañana de ese mismo día, antes del envío del correo electrónico. A base de ello, argumentó que no podía existir un nexo causal entre la actividad protegida y la acción adversa, ya que la determinación patronal precedió cronológicamente a la actividad protegida.

Asimismo, señaló que la señora Catinchi admitió en deposición que desconocía cuándo se tomó la decisión de no aprobar su período probatorio, cuáles fueron los criterios considerados y si

---

[3] *Véase*, Entrada Núm. 20, SUMAC TPI.

dicha decisión ya se había tomado al momento de enviar el correo electrónico. De este modo, sostuvo que ello impedía que la apelante pudiese refutar los hechos alegadamente incontrovertidos o establecer un caso *prima facie* de represalias. Además, argumentó que, aun si la apelante pudiese establecer un caso *prima facie*, existía una razón legítima y no discriminatoria para no aprobar el período probatorio.

A esos efectos, alegó que desde el 29 de febrero de 2024 se había considerado no aprobar el período probatorio debido a incumplimientos relacionados con el horario de entrada al trabajo. Indicó que los registros de ponche reflejaban tardanzas en varias fechas de febrero de 2024 y que ello constituyó la base de la determinación tomada. También sostuvo que, aunque la apelante alegara que llegaba a tiempo y ponchaba más tarde por atender asuntos de la farmacia, esta admitió que nunca informó que sus ponches no reflejaban su hora real de llegada ni solicitó correcciones a dichos registros.

Con relación a la reclamación bajo la Ley Núm.17-1931, *supra*, reiteró que dicha legislación solo aplicaba a empleados no exentos y que no existía controversia en cuanto a que la señora Catinchi era una empleada exenta. De igual forma, sostuvo que la Ley Núm. 17-1931, *supra,* no creaba una causa de acción por incumplimiento de contrato y que las alegaciones de la *Querella* resultaban contradictorias, ya que la apelante alegó por un lado que se realizaron deducciones ilegales de salario y, por otro, que autorizó las deducciones relacionadas con el plan médico.

Por último, argumentó que la alegación de incumplimiento de contrato carecía de fundamento, particularmente porque la señora Catinchi se encontraba en período probatorio, etapa durante la cual el patrono podía evaluar el desempeño del empleado y determinar si continuaba o no con el empleo sin que ello constituyera, según

alegó, una violación contractual. Por todo lo anterior, solicitó al Tribunal que dictara sentencia sumaria y desestimara con perjuicio todas las reclamaciones presentadas en la *Querella*.

Por su parte, ese mismo día, a saber, el 4 de marzo de 2025, la señora Catinchi presentó su *Moción de Sentencia Sumaria Parcial o para que se dicte Resolución Interlocutoria*.[4] En esta, solicitó que el Tribunal determinara, como cuestión de derecho, que logró establecer un caso *prima facie* de represalias al amparo de la Ley Núm. 115-1991, *supra*. Reiteró que trabajaba para Metro Caguas como Directora del Departamento de Farmacia y que, al momento de ser contratada, se le ofreció como beneficio el pago del cien (100%) por ciento de su plan médico. Indicó que, posteriormente se le informó que debía aportar una cantidad bisemanal para dicho plan y que autorizó el descuento correspondiente. Expresó que luego, el 1 de marzo de 2024, Recursos Humanos le notificó que la aportación previamente informada era errónea y que se realizarían descuentos adicionales en futuras nóminas para cubrir diferencias adeudadas.

Esbozó que ese mismo día, a las 4:37 p.m., envió un correo electrónico a la Directora de Recursos Humanos expresando su desacuerdo con el descuento adicional, indicando que entendía que el mismo era contrario a la Ley Núm.17-1931, *supra*, y manifestando que ni ella ni los empleados bajo su supervisión consentían a la deducción. Alegó que, al próximo día laborable, el 4 de marzo de 2024, fue despedida. A base de lo anterior, indicó que realizó una actividad protegida bajo la Ley Núm. 115-1991, *supra,* y que posteriormente fue objeto de una acción adversa, específicamente su despido, por lo que entendió que se configuró un caso *prima facie* de represalias. Argumentó que la proximidad temporal entre el

---

[4] *Véase*, Entrada Núm. 21, SUMAC TPI.

correo electrónico enviado el 1 de marzo de 2024 y su despido el 4 de marzo de 2024 era suficiente para establecer el nexo causal requerido en esta etapa procesal.

Además, insistió en que nunca fue objeto de amonestaciones, advertencias ni reuniones relacionadas con alegados incumplimientos de horario o desempeño antes de su despido. Asimismo, sostuvo que el asunto sometido al Tribunal en esta etapa no requería adjudicaciones sobre credibilidad o intención, sino únicamente determinar si, de los hechos alegadamente incontrovertidos y las admisiones de Metro Caguas, surgía un caso *prima facie* de represalias.

Por otro lado, reconoció que la apelada alegó en su contestación a la querella que: (1) la Ley Núm. 17-1931, *supra,* no le aplicaba por tratarse de una empleada exenta; (2) el ofrecimiento inicial sobre el plan médico fue un error; (3) tuvo alegados problemas relacionados con su horario durante el periodo probatorio; y (4) la decisión de despedirla se tomó durante la mañana del 1 de marzo de 2024, antes del envío del correo electrónico. No obstante, argumentó que, aun así, procedía que el Tribunal dictara sentencia sumaria parcial concluyendo que ella participó en una actividad protegida y que fue despedida subsiguientemente, configurándose así un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra.* Finalmente, sostuvo que cualquier controversia adicional sobre intención, pretexto, daños o remedios podría atenderse posteriormente en juicio o mediante otros escritos dispositivos.

En desacuerdo con la solicitud de sentencia sumaria presentada por Metro Caguas, el 25 de marzo de 2025, la señora Catinchi presentó una *Oposición a Moción de Sentencia Sumaria, Solicitud de Eliminación de Nuevas y Enmendadas Defensas Tardías, y Solicitud para que se dicte Sentencia a favor de la Parte*

*Querellante*.[5] Allí, sostuvo que Metro Caguas argumentó en su moción de sentencia sumaria que ella no podía establecer un caso *prima facie* de represalias bajo la Ley Núm. 115-1991, *supra*, porque la decisión de no aprobar su periodo probatorio y despedirla supuestamente fue tomada antes de que participara en la alegada actividad protegida, es decir, antes de enviar el correo electrónico del 1 de marzo de 2024 a las 4:37 p.m. mediante el cual expresó su desacuerdo con los descuentos relacionados al plan médico y alegó que tales descuentos eran ilegales.

Expresó que Metro Caguas también sostuvo, en la alternativa, que existía una razón legítima y no discriminatoria para despedirla, relacionada con alegados incumplimientos de horario durante su periodo probatorio. Sostuvo que, la apelada alegó en su moción dispositiva que, aun asumiendo que el horario de entrada de ella era a las 10:00 a.m., esta llegaba tarde en varias ocasiones. No obstante, argumentó que Metro Caguas estaba intentando cambiar su teoría del caso y enmendar tardíamente sus defensas afirmativas luego de culminado el descubrimiento de prueba. Indicó que, durante el pleito y en su *Contestación a la Querella*, Metro Caguas sostuvo consistentemente que el horario de entrada de la querellante era a las 9:00 a.m., mientras que en la moción de sentencia sumaria adoptó como supuesto que el horario era a las 10:00 a.m. para propósitos de su solicitud dispositiva.

Planteó que dicho cambio de teoría era improcedente en procedimientos sumarios laborales bajo la Ley Núm. 2, *supra*, y citó jurisprudencia que, según alegó, establecía que las partes no podían añadir nuevas defensas afirmativas ni enmendar alegaciones mediante mociones de sentencia sumaria. Por ello, solicitó que el Tribunal descartara los hechos y argumentos que, según alegó,

---

[5] *Véase*, Entrada Núm. 21, SUMAC TPI.

intentaban incorporar defensas nuevas no planteadas originalmente. Además, reiteró las alegaciones de su querella original.

Ese mismo día, a saber, el 25 de marzo de 2025, la apelada presentó una *Oposición "Moción de Sentencia Sumaria Parcial a para que se dicte Resolución Interlocutoria"*.[6] En esta, insistió que la señora Catinchi no logró establecer un caso *prima facie* de represalias al amparo de la Ley Núm. 115-1991, *supra*, y que, por lo tanto, no procedía conceder el remedio solicitado ni celebrar un juicio sobre dicha reclamación.

Indicó que la teoría de la apelante descansaba exclusivamente en la proximidad temporal entre el envío del correo electrónico del 1 de marzo de 2024 —alegada actividad protegida— y la notificación de su despido el 4 de marzo de 2024. No obstante, insistió que la decisión de no aprobar el periodo probatorio y terminar el empleo de la apelante se tomó antes de que ésta participara en la actividad protegida. Asimismo, alegó que al momento de tomar dicha decisión el licenciado Marcial no tenía conocimiento de actividad protegida alguna por parte de la señora Catinchi. Así pues, reiteró que ello impedía establecer el nexo causal requerido para configurar un caso *prima facie* de represalias, ya que la actividad protegida debía preceder la acción adversa para que pudiese inferirse represalia. Además, añadió que el momento determinante no era cuándo se notificó la decisión de despido, sino cuándo ésta fue tomada.

Por otro lado, expuso que la apelante no presentó prueba para establecer otros elementos del alegado nexo causal, tales como trato desigual frente a otros empleados, incongruencias en la razón ofrecida para la terminación de empleo o un patrón de conducta antagónica. A su vez, nuevamente señaló que la señora Catinchi

---

[6] *Véase*, Entrada Núm. 26, SUMAC TPI.

admitió bajo juramento que no sabía cuándo se tomó la decisión de despedirla, cuáles criterios se consideraron para ello ni si dicha decisión ya había sido tomada al momento de enviar el correo electrónico del 1 de marzo de 2024.

Además, insistió que la razón para no aprobar el periodo probatorio de la apelante fue el incumplimiento con el horario de trabajo. Sobre ello, sostuvo que no estaba en controversia que la señora Catinchi tenía responsabilidades relacionadas al cumplimiento de horario y que, según el registro de ponches, llegaba al trabajo pasadas las 10:00 a.m. Alegó también que antes del 1 de marzo de 2024 el licenciado Marcial ya había considerado no aprobar el periodo probatorio y había solicitado los registros de ponches de la querellante.

Como parte de los hechos que propuso como incontrovertidos, sostuvo que el 29 de febrero de 2024 el licenciado Marcial solicitó los ponches de la apelante; que el 1 de marzo de 2024 en horas de la mañana recibió dichos registros y tomó la decisión final de no aprobar el periodo probatorio; que al momento de tomar dicha decisión no conocía de ninguna queja presentada por la señora Catinchi; y que esta última participó en la alegada actividad protegida a las 4:37 p.m. de ese mismo día mediante correo electrónico.

Apoyó sus planteamientos en jurisprudencia estatal y federal relacionada con reclamaciones de represalias bajo la Ley Núm. 115-1991, *supra*, y el Título VII federal, incluyendo casos en los que se resolvió que no existe nexo causal cuando la decisión adversa fue tomada antes de la actividad protegida o cuando el patrono desconocía dicha actividad al momento de tomar la decisión. Por todo lo antes expuesto, solicitó que se declarara No Ha Lugar la solicitud de sentencia sumaria parcial presentada por la apelante y

que se desestimara sumariamente la reclamación de represalias en su totalidad.

Posteriormente, el 4 de abril de 2025, la apelante presentó su *Réplica a Oposición a Moción de Sentencia Sumaria Parcial o para que se dicte Resolución Interlocutoria.*[7] En síntesis, alegó que estableció un caso *prima facie* de represalias al demostrar que el 1 de marzo de 2024 envió un correo electrónico al Departamento de Recursos Humanos denunciando alegadas retenciones ilegales de salario en violación a la Ley Núm.17-1931, *supra*, y que fue despedida el próximo día laborable, el 4 de marzo de 2024. Sostuvo que múltiples hechos propuestos en su moción quedaron incontrovertidos porque fueron admitidos por Metro Caguas en su *Contestación a la Querella* o parcialmente admitidos en su oposición. Planteó que tales admisiones constituían relevo de prueba conforme al principio de admisión de parte.

En cuanto al planteamiento principal de Metro Caguas, argumentó que la Ley Núm.115-1991, *supra*, no requería que el empleado probara cuándo el patrono tomó internamente la decisión de despedirlo ni el supuesto "pensamiento" del patrono previo a la actividad protegida. Expuso que, según el texto de la ley, únicamente requería demostrar que el empleado participó en una actividad protegida y que posteriormente fue despedido. Así, sostuvo que la acción adversa relevante era el despido mismo y no el proceso mental interno alegadamente realizado por el patrono antes de notificarlo.

Asimismo, expresó que la apelada interpretó erróneamente la jurisprudencia aplicable al exigirle demostrar elementos adicionales de causalidad en esta etapa. Citó casos del Tribunal Supremo de Puerto Rico para sostener que la cercanía temporal entre la actividad

---

[7] *Véase*, Entrada Núm. 26, SUMAC TPI.

protegida y el despido puede ser suficiente para establecer el caso *prima facie* y activar la presunción de represalias. Respecto al caso *Rivera v. Saint John's School*, KLAN202100864, indicó que Metro Caguas omitió que en dicho caso primero se reconoció la existencia de un caso *prima facie* antes de que el patrono presentara evidencia para derrotar la presunción. Argumentó que la apelada confundió las distintas etapas probatorias bajo la Ley Núm. 115-1991, *supra*, al intentar derrotar el caso *prima facie* desde el inicio mediante alegaciones relacionadas con la supuesta intención previa del patrono.

Además, cuestionó la credibilidad y suficiencia de la declaración jurada del licenciado Marcial, mediante la cual Metro Caguas alegó que la decisión de despedirla se tomó antes del correo electrónico del 1 de marzo de 2024. Sostuvo que dicha teoría dependía de elementos subjetivos de intención y credibilidad que debían dilucidarse en un juicio plenario. Asimismo, señaló que, Metro Caguas permitió que continuara trabajando el 1 de marzo de 2024 aun cuando alegadamente ya había decidido despedirla, lo que, según argumentó, resulta incongruente. Añadió que la supervisora de Recursos Humanos recibió el correo electrónico sobre las alegadas prácticas ilegales el mismo día y posteriormente participó en la notificación del despido.

Por otro lado, reiteró que Metro Caguas había intentado modificar tardíamente sus defensas respecto al supuesto horario de trabajo de ella y alegó que nunca se le notificó incumplimiento alguno relacionado con asistencia o puntualidad. Expuso que la prueba presentada por la apelada sobre alegados incumplimientos era contradictoria, generalizada y poco específica. Finalmente, sostuvo que la razón ofrecida por Metro Caguas para justificar el despido constituía un pretexto para encubrir represalias por haber participado en una actividad protegida. Por ello, solicitó que el

Tribunal declarara No Ha Lugar la oposición de Metro Caguas y concediera la solicitud de sentencia sumaria parcial a su favor.

Por su parte, ese mismo día, a saber, el 4 de abril de 2025, Metro Caguas presentó su *Réplica a "Oposición a Moción de Sentencia Sumaria, Solicitud de Eliminación de Nuevas y Enmendadas Defensas Tardías, y Solicitud para que se dicte Sentencia a favor de la Querellante"*.[8] En síntesis, sostuvo que la apelante no logró controvertir el hecho que considera medular del caso: que la decisión de no aprobar su periodo probatorio y proceder con el despido fue tomada antes de que esta participara en la alegada actividad protegida. Asimismo, reiteró que la señora Catinchi admitió no saber cuándo se tomó dicha decisión ni los criterios utilizados para ello, por lo que no podía establecer el nexo causal necesario para configurar un caso prima facie de represalias bajo la Ley 115-1991, *supra.*

Argumentó que era en la etapa de oposición a la solicitud de sentencia sumaria donde la apelante venía obligada a presentar prueba para controvertir los hechos propuestos en la *Moción de Sentencia Sumaria* y demostrar el nexo causal. Alegó que la apelante no presentó evidencia admisible suficiente y que, en lugar de ello, recurrió a alegaciones especulativas, negaciones generales y hechos inmateriales que no derrotaban los hechos incontrovertidos presentados por la parte patronal.

Además, rechazó el planteamiento de la señora Catinchi de que ellos habían intentado enmendar sus alegaciones al asumir, para fines de la *Moción de Sentencia Sumaria*, que el horario de entrada de ella era a las 10:00 a.m. Indicó que ello no constituía una enmienda de alegaciones ni un cambio de teoría, sino una estrategia alternativa para demostrar que, aun bajo la versión más favorable a

---

[8] *Véase*, Entrada Núm. 31, SUMAC TPI.

la apelante, existía incumplimiento con el horario de trabajo. Sostuvo que siempre se mantuvo consistente en que la razón para no aprobar el periodo probatorio fue el incumplimiento reiterado con el horario.

En cuanto a los cuestionamientos de la apelante sobre la declaración jurada del licenciado Marcial, sostuvo que esta última no presentó prueba admisible para controvertir dicha declaración ni para impugnar su credibilidad. Alegó que las críticas de la señora Catinchi eran meramente especulativas y retóricas, y reiteró que la existencia de alegaciones sobre intención o elementos subjetivos no impedía la adjudicación sumaria cuando no existían controversias reales sobre hechos materiales.

Señaló además que, de los treinta y ocho (38) hechos incontrovertidos incluidos en su *Moción de Sentencia Sumaria*, la apelante admitió total o parcialmente la mayoría de ellos y que las alegadas controversias levantadas por esta consistían en argumentos legales adicionales o hechos que no refutaban realmente los hechos propuestos. Finalmente, reiteró que la apelante no presentó evidencia admisible capaz de controvertir la prueba presentada por ellos, incluyendo la alegada razón legítima para el despido, a saber, el incumplimiento reiterado con el horario de trabajo. Sostuvo que las alegaciones de la apelante no creaban controversias reales de hechos materiales y que no existía razón válida para celebrar un juicio. Por ello, solicitó que el Tribunal declarara No Ha Lugar la oposición de la señora Catinchi, declarara Ha Lugar la *Moción de Sentencia Sumaria* de ellos y desestimara con perjuicio la *Querella* en su totalidad.

Posteriormente, las partes presentaron sus respectivas dúplicas reiterando todo lo antes expuesto.[9] Evaluadas las posturas

---

[9] *Véase*, Entradas 33 y 34, SUMAC TPI.

de ambas partes, el 26 de abril de 2026, el TPI emitió una *Sentencia* que se notificó el 28 de abril de 2026. En primer lugar, formuló las siguientes determinaciones de hechos:

1. La Sra. Karla Catinchi, parte querellante, es doctora en farmacia.

2. El 1ro de julio de 2023, la parte querellante asumió la Regencia de la farmacia clínica del Hospital Hima Caguas.

3. En noviembre de 2023, el Metro Caguas Incorporated compró los activos del Hospital HIMA San Pablo Caguas.

4. El Hospital Pavía Caguas comenzó operaciones el 20 de diciembre de 2023, tras la compraventa de activos de lo que era el Hospital HIMA San Pablo Caguas.

5. El 18 de diciembre de 2023, la querellante firmó una Oferta Condicionada de Empleo con el Hospital Pavía Caguas.

6. La oferta en su anejo establecía que el patrono aportaba el 100% del plan médico.

7. La carta establecía que cualquier enmienda al documento (Oferta de empleo) debe constar por escrito y ser firmada por un oficial autorizado a tales propósitos.

8. La querellante comenzó a trabajar para el Hospital el 20 de diciembre de 2023, en virtud de un Nombramiento Probatorio, suscrito el 16 de enero de 2024.

9. El periodo probatorio anunciado el 20 de diciembre de 2023 fue de seis meses.

10. La carta advierte que durante el periodo probatorio la parte querellante debía demostrar que "puede desempeñar satisfactoriamente las funciones y responsabilidades que se le asignen y que su conducta le acredita como empleado (a) nuestro (a). Asimismo deberá dar cumplimiento a los reglamentos, manuales, procedimientos y normas de la institución".

11. La querellante fue contratada por el Hospital para el puesto de Directora de Farmacia.

12. El supervisor directo de la querellante mientras fungió como Directora de Farmacia en el Hospital fue el Lcdo. Juan C. Marcial.

13. Como Directora de Farmacia en Pavía Caguas, la querellante tenía, entre otras, las siguientes funciones y responsabilidades:

   a. cumplir con el horario de trabajo.

   b. cumplir con las instrucciones del patrono.

   c. administrar todo lo relacionado a la farmacia clínica del Hospital, incluyendo el manejo, adquisición y descarte de todos los medicamentos del Hospital.

   d. supervisar a sus empleados, incluyendo reunirlos y llevar su nómina.

   e. mantener comunicación con los múltiples departamentos administrativos y clínicos.

   f. participar y liderar los comités pertinentes del Departamento de Farmacia.

   g. mantener comunicación con los líderes administrativos.

   h. h. velar por el cumplimiento con los estándares de las agencias acreditadoras y requerimientos de las leyes estatales y federales de la profesión.

14. El horario de la Farmacia de Pavía Caguas era de 6:00 a.m. a 11:00 p.m.

15. Durante el mes de enero la querellante aceptó que se le descontara una aportación para el seguro médico.

16. El 25 de enero de 2024, la Sra. Margie Rosario ("Sra. Rosario"), entonces Supervisora de Recursos Humanos del Hospital, citó a la querellante a una reunión en la que se estableció el horario de trabajo de la querellante.

17. Ese mismo día 25 de enero de 2024, la Sra. Rosario le envió al Licenciado Marcial un correo electrónico sobre "Reunión Dra. Catinchi" informándole el propósito de la reunión.

18. El 29 de enero de 2024, la Sra. Rosario citó a la querellante a otra reunión donde se habló sobre el horario de la querellante.

19. La querellante declaró que le indicó a la Sra. Rosario que su horario de entrada al trabajo era de diez (10:00 a.m.) a siete (7:00 p.m.).

20. El sistema de ponches del Hospital entró en vigor el 18 de febrero de 2024.

21. Desde ese momento, a la querellante se le requirió ponchar la hora de entrada y salida al Hospital.

22. A todo empleado exento del Hospital, incluyendo a la Dra. Catinchi, se le requirió ponchar su hora de entrada y salida al trabajo de manera que se pudiera llevar un registro de asistencia y puntualidad.

23. El reporte de asistencia es el registro de asistencia de la querellante y era el reporte que veía el patrono.

24. De acuerdo con el registro de ponches de la querellante, sus horas del 18 de febrero de 2024 al 1 de marzo de 2024 la querellada registró su entrada puntualmente en tres ocasiones y registró su entrada pasada las 10 de la mañana en seis ocasiones.

25. El 29 de febrero de 2024, el licenciado Marcial le solicitó a la Lcda. Miressa Rivera Gerena ("Licenciada Rivera"), Administradora Asociada, el reporte de ponches de la querellante.

26. El 1 de marzo de 2024, en horas de la tarde, la querellante tuvo una reunión con la Sra. Rosario donde se le contestaron preguntas relacionadas a una carta con fecha del 29 de febrero de 2024, entregada en esa reunión, sobre "Notificación de error en su descuento de su seguro médico.

27. El error consistía en que a partir del 1 de marzo había que descontar una cantidad mayor a la informada por concepto de plan médico.

28. El 1 de marzo de 2024 a las 4:37 p.m., la querellante le envió a la Sra. Rosario un correo electrónico sobre "Notificación de error en su descuento de seguro médico Karla Catinchi".

29. En el mismo, la querellante, entre otras cosas, expresa no estar de acuerdo en que le realicen deducciones retroactivas para atender el error en el descuento del seguro médico.

30. El 4 de marzo del 2024, mediante carta firmada por el licenciado Marcial, se le notificó a la querellante que "Efectivo el 4 de marzo de 2024 el Hospital Pavía Caguas procede a dejar vacante su puesto de Directora por no aprobar el periodo probatorio.

31. El puesto de Directora de Farmacia que ocupaba la querellante estaba clasificado como uno exento.

Luego, conforme a estas determinaciones de hechos, la prueba documental que obra del expediente y el derecho aplicable, el TPI declaró Ha Lugar la *Moción de Sentencia Sumaria* presentada por Metro Caguas. Particularmente, expresó que la apelante alegó haber sido víctima de represalias luego de enviar una comunicación escrita en la que expresó su desacuerdo con que el patrono le descontara de su salario cantidades adicionales para corregir un error relacionado con la retención del plan médico. Indicó que, la propuesta patronal consistía en descontarle $28.40 durante las próximas tres nóminas, para un total aproximado de ochenta y cinco dólares. Ante ello, indicó que se le hacía difícil creer que un patrono despidiera a un empleado únicamente por esa diferencia económica.

Asimismo, señaló que de los documentos firmados por la señora Catinchi surgía que ésta última había sido advertida de que los términos relacionados al plan médico podían sufrir enmiendas y que cualquier cambio sería notificado por escrito, como ocurrió en este caso. No obstante, indicó que la carta enviada por la apelante no fue el único elemento considerado por el patrono. Determinó que, previo al envío de dicha comunicación, la empleada había sido llamada a reuniones donde se le señalaron incumplimientos relacionados con su horario de trabajo. Señaló, el horario esperado por el patrono era de 10:00 a.m. a 7:00 p.m.

Destacó que el récord reflejaba que únicamente durante los primeros tres días desde que se instaló el sistema de ponche la señora Catinchi registró su entrada a las 10:00 a.m. Aunque también surgía del récord que frecuentemente salía después de las

7:00 p.m., sostuvo que no se presentó prueba de que el patrono le hubiese autorizado a entrar más tarde al día siguiente por haber salido tarde el día anterior.

Además, concluyó que la prueba demostraba que la apelante, por iniciativa propia, registraba su entrada cuando quería, pese a haber recibido instrucciones de ponchar al llegar y de conocer que su horario comenzaba a las 10:00 a.m. Expresó que el período probatorio existía para que el patrono pudiese evaluar la competencia y eficiencia del empleado y que, aunque la apelante tenía experiencia previa, su relación laboral con Metro Caguas apenas comenzaba.

De igual forma señaló que, durante el corto tiempo que estuvo empleada, la señora Catinchi fue llamada en al menos dos ocasiones para discutir problemas relacionados con su patrón de entrada al trabajo. Así pues, determinó que el patrono logró demostrar que las reglas eran razonables, particularmente el requerimiento de mantener un horario y registrar la entrada al llegar al trabajo, y que dichas reglas fueron notificadas a la apelante, quien posteriormente las incumplió reiteradamente.

En cuanto a los planteamientos de la apelante sobre la declaración jurada del licenciado Marcial, el Tribunal reconoció que esta había cuestionado dicha declaración por contener elementos subjetivos y de intención. También reconoció que la apelante argumentó que, para efectos de una reclamación de represalias, lo importante no era cuándo el patrono pensó despedirla, sino cuándo efectivamente ocurrió el despido. Expresó que en esto la señora Catinchi tenía razón. Sin embargo, concluyó que, aun sin tomar en consideración elementos subjetivos o de intención, existía prueba objetiva suficiente para establecer los hechos materiales relacionados con el incumplimiento de la apelante. Determinó que, por preponderancia de la prueba, no existía controversia material

sobre que la empleada estaba en período probatorio, que conocía las reglas del patrono y que, aun así, hizo caso omiso de ellas. En consecuencia, resolvió que el despido de la apelante fue justificado y, en consecuencia, desestimó la *Querella* y ordenó el cierre y archivo del caso.

Inconforme con este dictamen, el 8 de mayo de 2026, la señora Catinchi presentó el recurso de epígrafe y formuló los siguientes señalamientos de error:

**ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ANALIZAR LA RECLAMACIÓN BAJO UN MARCO JURÍDICO INCORRECTO, PROPIO DE DESPIDO INJUSTIFICADO, EN LUGAR DE APLICAR EL ESQUEMA PROBATORIO DE LA LEY NÚM. 115-1991.**

**ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO RECONOCER EXPRESAMENTE QUE LA QUERELLANTE ESTABLECIÓ UN CASO PRIMA FACIE DE REPRESALIAS.**

**ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA SUMARIA ADJUDICANDO CREDIBILIDAD Y APLICANDO UN ESTÁNDAR DE "PREPONDERANCIA DE LA PRUEBA", EN CONTRAVENCIÓN AL ESTÁNDAR APLICABLE BAJO LA REGLA 36 DE PROCEDIMIENTO CIVIL.**

**ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL ACEPTAR COMO INCONTROVERTIDA LA ALEGADA JUSTIFICACIÓN PATRONAL, A PESAR DE LAS INCONSISTENCIAS SUSTANCIALES EN EL RÉCORD SOBRE EL SUPUESTO HORARIO DE TRABAJO, LA AUSENCIA DE PRUEBA OBJETIVA SOBRE REGLAS APLICABLES Y LA EVIDENCIA PRESENTADA POR LA QUERELLANTE QUE APUNTABA A PRETEXTO.**

Atendido el recurso, el 11 de mayo de 2026, emitimos una *Resolución* concediéndole a la parte apelada hasta el 26 de mayo de 2026 para presentar su alegato en oposición. Oportunamente, Metro Caguas presentó un *Alegato en Oposición de la Parte Apelada* y negó que el TPI cometiera los errores que la apelante le imputó. Con el beneficio de la comparecencia de ambas partes, procedemos a atender el asunto ante nos. *Veamos.*

## II.

### -A-

En esencia, como mencionamos anteriormente, el principio rector de las Reglas de Procedimiento Civil es proveerles a las partes envueltas en un pleito legal, una solución justa, rápida y económica en todo procedimiento. Regla 1 de Procedimiento Civil, 32 LPRA Ap. V, R.1. El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36, hace viable este objetivo en aquellos casos en que surja de forma clara que no existen controversias materiales de hechos que requieren ventilarse en un juicio plenario y el derecho así lo permita.

Conforme a la Regla 36.3 (e) de Procedimiento Civil, *supra,* se dictará sentencia sumaria "si las alegaciones, deposiciones, contestaciones e interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente, y, además, si el derecho aplicable así lo justifica". A estos efectos, el foro judicial tiene la potestad para disponer de asuntos pendientes sin la necesidad de celebrar un juicio, esto debido a que lo que restaría sería aplicar el derecho a los hechos no controvertidos. *Roldan Flores v. M. Cuebas et al.,* 199 DPR 664, 676 (2018).

Es menester destacar que, solo procede dictar sentencia sumaria cuando surge claramente que el promovido no puede prevalecer y que el Tribunal cuenta con la verdad de todos los hechos necesarios para poder resolver la controversia. *Mejías et al. v. Carrasquillo et al.,* 185 DPR 288, 299 (2012). Por lo tanto, no procede dictar sentencia sumaria cuando no existe una clara certeza sobre todos los hechos materiales en la controversia. Íd. Aun así, "[c]ualquier duda no es suficiente para derrotar una moción de sentencia sumaria, sino que tiene que ser una cuestión que permita

concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes". *Aponte Valentín et al. v. Pfizer Pharm.*, 208 DPR 263, 277 (2021).

La Regla 36.2 de Procedimiento Civil, *supra*, permite que cualquier parte presente una moción, basada en declaraciones juradas, o en aquella evidencia que demuestre la inexistencia de una controversia sustancial de hechos esenciales y pertinentes, para que el tribunal dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación. Al solicitar dicho remedio, la parte que promueve la sentencia sumaria "deberá establecer su derecho con claridad y demostrar que no existe controversia sustancial sobre algún hecho material, o sea, sobre ningún componente de la causa de acción". *Mun. de Añasco v. ASES et al.,* 188 DPR 307, 310 (2013).

Por su parte, la parte que se opone a la sentencia sumaria no puede tomar una actitud pasiva y descansar en las aseveraciones o negaciones consignadas en su alegación. *Roldán Flores v. M. Cuebas et al., supra*, pág. 677. Por el contrario, esa persona viene obligada a enfrentar la moción de su adversario de forma tan detallada y especifica como lo ha hecho el promovente en su solicitud puesto que, si incumple con lo antes mencionado corre el riesgo de que se dicte sentencia es su contra. *SLG Zapata- Rivera v. J.F. Montalvo*, supra, pág. 432. Específicamente, la Regla 36.3 de Procedimiento Civil, *supra,* expone los criterios que debe cumplir la parte que se opone a la moción de sentencia sumaria. Al amparo de dicha regla, en la oposición a la solicitud de sentencia sumaria el promovido debe, como parte de su carga desglosar los hechos sobre los que aduce que no existe controversia, y, además para cada uno de ellos debe especificar la página o párrafo de la declaración jurada u otra prueba admisible en evidencia que lo apoya.

En síntesis, no procede dictar sentencia sumaria cuando: (1) existen hechos materiales y esenciales en controversia; (2) hay alegaciones afirmativas en la demanda que no han sido refutadas; (3) surge de los propios documentos que se acompañan con la moción de sentencia sumaria una controversia real sobre algún hecho material y esencial; (4) como cuestión de derecho no procede. *Pepsi-Cola v. Mun. Cidra, et al.*, 186 DPR 713, 757 (2012).

Ahora bien, según *Vera v. Dr. Bravo*, 161 DPR 308, 334-335 (2004) este Foro Apelativo utilizará los mismos criterios que el TPI al determinar si procede una sentencia sumaria. Sin embargo, el Tribunal Supremo especifica que, al revisar la determinación de primera instancia sólo podemos considerar los documentos que se presentaron ante el TPI. Íd. Además, sólo podemos determinar si existe o no alguna controversia genuina de hechos materiales y esenciales, y si el derecho se aplicó de forma correcta. Íd. Es decir, no podemos adjudicar los hechos materiales y esenciales en disputa, ya que esta tarea le corresponde al TPI. Íd.

Por otro lado, en *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015), el Tribunal Supremo estableció que al revisar una determinación del TPI en la que se concedió o denegó una moción de sentencia sumaria debemos: (1) examinar de *novo* el expediente; (2) revisar que la moción de sentencia sumaria y su oposición cumplan con los requisitos de forma codificados en la Regla 36 de Procedimiento Civil, *supra,* y con los discutidos en *SLG Zapata-Rivera v. J. Montalvo, supra;* (3) en el caso de una revisión de una sentencia dictada sumariamente, debemos revisar si en realidad existen hechos materiales en controversia, y de haberlos, exponer concretamente cuáles están en controversia y cuáles no; y (4) de encontrar que los hechos materiales no están en controversia, debemos revisar de *novo* si el Tribunal de Primera Instancia aplicó

correctamente el derecho. *Rivera Matos, et al. v. Triple-S et al.,* 204 DPR 1010, 1025 (2020).

**-B-**

El Art. 2 de la Ley Núm. 115-1991, 29 LPRA sec. 194a, establece que:

(a) Ningún patrono podrá despedir, amenazar o discriminar contra un "empleado con relación a los términos, condiciones, compensación, ubicación, beneficios o privilegios del empleo porque el empleado ofrezca o intente ofrecer, verbalmente o por escrito, cualquier testimonio, expresión o información ante un foro legislativo, administrativo o judicial en Puerto Rico, **así como el testimonio, expresión o información que ofrezca o intente ofrecer, en los procedimientos internos establecidos de la empresa, o ante cualquier empleado o representante en una posición de autoridad, cuando dichas expresiones no sean de carácter difamatorio ni constituyan divulgación de información privilegiada establecida por ley.**

(b) Cualquier persona que alegue una violación a esta Ley podrá instar una acción civil en contra del patrono dentro de tres (3) años de la fecha en que ocurrió dicha violación y solicitar se le compense por los daños reales sufridos, las angustias mentales, la restitución en el empleo, los salarios dejados de devengar, beneficios y honorarios de abogado. La responsabilidad del patrono con relación a los daños y a los salarios dejados de devengar, será el doble de la cuantía que se determine causó la violación a las disposiciones de esta Ley.

(c) El empleado deberá probar la violación mediante evidencia directa o circunstancial. **El empleado podrá además establecer un caso prima facie de violación a la ley probando que participó en una actividad protegida por esta Ley y que fue subsiguientemente despedido, amenazado o discriminado en su contra de su empleo. Una vez establecido lo anterior, el patrono deberá alegar y fundamentar una razón legítima y no discriminatoria para el despido. De alegar y fundamentar el patrono dicha razón, el empleado deberá demostrar que la razón alegada por el patrono era un mero pretexto para el despido.** (Énfasis nuestro).

Como podemos observar, la Ley Núm. 115-1991*, supra,* protege a los empleados contra represalias por ofrecer o intentar ofrecer información o expresiones en procedimientos internos de una empresa o ante personal con autoridad, siempre que no sean difamatorias ni divulguen información privilegiada. Así, el propósito del estatuto es proteger a los empleados de cualquier discrimen por

medio de represalias por participar en una actividad protegida. *Ocasio v. Kelly Servs.* 163 DPR 653, 684 (2005).

Un obrero tiene dos (2) maneras de establecer un caso de represalias, esto es: (a) probar la violación mediante evidencia directa o circunstancial; o (b) establecer la presunción *juris tantum* de la Ley Núm. 115-1991, *supra. S.L.G. Rivera Carrasquillo v. A.A.A.,* 177 DPR 345, 362 (2009). Así, una vez el obrero presenta un caso *prima facie*, se crea una presunción de que el despido fue en represalias. Íd., pág. 361. **Un empleado establece un caso *prima facie* cuando prueba que: (1) participó en una actividad protegida por la ley; y (2) subsiguientemente fue despedido, amenazado o discriminado en su empleo.** (Énfasis nuestro). Íd., pág. 362. **Establecido lo anterior, le corresponde al patrono rebatir la presunción fundamentando el despido legítimamente.** (Énfasis nuestro). Íd. En caso de que el patrono cumpla con el segundo paso, **el empleado debe demostrar que la razón alegada por el patrono es un mero pretexto para la acción adversa.** (Énfasis suplido) Íd.

En cuanto al segundo requisito, que exige que el empleado haya sido despedido, amenazado o discriminado en el empleo subsiguiente a su incursión en la actividad protegida, el Tribunal Supremo explicó que **la proximidad temporal es suficiente al momento de establecer un caso *prima facie*.** (Énfasis nuestro). *Rivera Menéndez v. Action Service*, 185 DPR 431, 446 (2012). Sobre el particular, indicó que "el legislador pretendió que, al establecer su caso *prima facie*, el empleado no se enfrentara a un proceso probatorio oneroso, sino que bastara su comprobación de que la acción adversa que experimentó ocurrió al poco tiempo de haber incurrido en la alegada actividad protegida. *Feliciano Martes v. Sheraton*, 182 DPR 368, 399-400 (2011).

III.

En el presente caso, la señora Catinchi impugnó una *Sentencia* que el TPI dictó el 26 de abril de 2026 y notificó el 28 de abril de 2026 mediante la cual, en esencia, declaró Ha Lugar la *Moción de Sentencia Sumaria* que presentó Metro Caguas y, por consiguiente, determinó que el despido de la apelante fue justificado. Así pues, desestimó la *Querella* que presentó la apelante y ordenó el cierre y archivo del caso. Ante ello, la apelante sostiene que el TPI erró al analizar la reclamación bajo el marco jurídico aplicable a despido injustificado, en lugar del esquema probatorio dispuesto en la Ley Núm. 115-1991, *supra*; al no reconocer que esta estableció un caso *prima facie* de represalias; al adjudicar credibilidad y aplicar un estándar de preponderancia de la prueba en la etapa sumaria; y al aceptar como incontrovertida la alegada justificación patronal pese a las inconsistencias y evidencia de posible pretexto que surgían del récord.

Como es sabido, es norma reiterada que el mecanismo de sentencia sumaria, consagrado en la Regla 36 de Procedimiento Civil, *supra*, persigue adelantar una solución justa, rápida y económica de los pleitos, conforme al mandato rector de la Regla 1 de Procedimiento Civil, *supra*. Procede su concesión cuando de los documentos que obran en autos surge que no existe controversia real y sustancial sobre hechos esenciales y pertinentes y el derecho aplicable así lo justifica. *Roldán Flores v. M. Cuebas et al.*, supra, pág. 676; Regla 36.3(e) de Procedimiento Civil, *supra*.

Al revisar la concesión de una solicitud de sentencia sumaria, este Tribunal Apelativo examina el expediente de *novo* y aplica los mismos criterios que el TPI. *Vera v. Dr. Bravo*, supra, págs. 334-335; *Meléndez González et al. v. M. Cuebas*, supra, pág. 118. Asimismo, le corresponde evaluar si la moción y su oposición cumplieron con los requisitos formales de la Regla 36.3 de Procedimiento Civil,

*supra*, y determinar si existen hechos materiales en controversia o si solo resta aplicar el derecho a hechos no disputados. *Rivera Matos et al. v. Triple-S et al.*, supra, pág. 1025. Al evaluar los escritos presentados por las partes resolvemos que, en esencia, ambas cumplieron con los referidos requisitos. Resuelto lo anterior, nos corresponde evaluar si existen hechos materiales en controversia que nos impidan dictar sentencia sumaria.

Luego de revisar la totalidad del expediente, examinar los argumentos de ambas partes y aquilatar la prueba documental que obra en autos, concluimos que no existen hechos materiales y sustanciales en controversia que impidan disponer del caso sumariamente. Así pues, adoptamos en su totalidad las determinaciones de hechos formuladas por el TPI en la *Sentencia* apelada. En consecuencia, resta determinar si el TPI aplicó correctamente el derecho.

Ciertamente, le asiste la razón parcialmente a la apelante cuando señala que el TPI no estructuró su análisis conforme al esquema probatorio particular dispuesto en la Ley Núm. 115-1991, *supra*. Ello, pues la *Sentencia* apelada enfocó gran parte de su discusión en la razonabilidad de las normas patronales y en la justificación del despido durante el periodo probatorio, análisis más afín a una reclamación ordinaria de despido injustificado. Sin embargo, dicho defecto metodológico no altera el resultado alcanzado por el TPI, ya que, aun bajo el análisis correcto requerido por la Ley Núm. 115-1991, *supra*, procede igualmente la desestimación sumaria de la reclamación de represalias.

El Art. 2(c) de la Ley Núm. 115-1991, *supra*, establece un esquema probatorio escalonado. Conforme a dicho estatuto, el empleado puede establecer un caso *prima facie* demostrando que participó en una actividad protegida y que posteriormente fue despedido, amenazado o discriminado en el empleo. *S.L.G. Rivera*

*Carrasquillo v. A.A.A.,* supra, pág. 362. Una vez el empleado satisface ese umbral inicial, surge una presunción *juris tantum* de represalias y entonces corresponde al patrono alegar y fundamentar una razón legítima y no discriminatoria para la acción adversa. Íd. De cumplir con ello, el peso retorna al empleado, quien deberá demostrar que la razón ofrecida es un mero pretexto. Íd.

A la luz de dicho marco jurídico, no hay duda de que la apelante logró establecer una presunción *juris tantum* de represalias. No existe controversia en cuanto a que la apelante participó en una actividad protegida al enviar un correo electrónico el 1 de marzo de 2024 a la directora de Recursos Humanos expresando desacuerdo con unas deducciones salariales relacionadas al plan médico. Tampoco está en controversia que posteriormente, el próximo día laborable, se le notificó la terminación de su empleo. Conforme a la jurisprudencia interpretativa de la Ley Núm. 115-1991, *supra,* la proximidad temporal entre la actividad protegida y la acción adversa es suficiente para satisfacer esta etapa inicial del análisis. *Rivera Menéndez v. Action Service,* supra, pág. 446.

Ahora bien, como es sabido, el establecimiento de una presunción *juris tantum* de represalias no pone fin al análisis. Correspondía entonces a Metro Caguas articular y fundamentar una razón legítima y no discriminatoria para la terminación del empleo. Del expediente surge que Metro Caguas sostuvo consistentemente que la decisión de no aprobar el periodo probatorio de la apelante respondió a incumplimientos reiterados con el horario de trabajo. En específico, la prueba documental reflejó que el patrono esperaba que la apelante trabajara en horario de 10:00 a.m. a 7:00 p.m., que esta había sido llamada a reuniones relacionadas con sus tardanzas y que el supervisor ya había comenzado a verificar los registros de

asistencia antes de que la apelante enviara el correo electrónico del 1 de marzo de 2024.

En efecto, surge del expediente que la señora Rosario remitió varios correos electrónicos al licenciado Marcial relacionados con las preocupaciones patronales sobre el cumplimiento horario de la apelante. Particularmente, en un correo electrónico fechado el 25 de enero de 2024, la señora Rosario informó los resultados de una reunión sostenida con la señora Catinchi.[10] Allí indicó que la apelante sostuvo que durante la entrevista celebrada el 19 de diciembre de 2023 había dialogado sobre un horario de entrada a las 10:00 a.m.; que dicho horario incluso se había incluido en documentos relacionados con la licencia de farmacia; y que no estaba disponible para entrar antes de esa hora, aunque solicitó una reevaluación del acuerdo inicial.

Asimismo, en un correo electrónico del 30 de enero de 2024, la señora Rosario informó que nuevamente se reunió con la apelante para notificarle que el horario de entrada requerido sería no más tarde de las 9:00 a.m.[11] Además de dicha comunicación surge que la apelante indicó que realizaría los ajustes personales necesarios para cumplir con el horario de entrada requerido. Así pues, contrario a la teoría de represalias planteada por la apelante, el expediente demuestra que el patrono ya venía interviniendo y atendiendo preocupaciones relacionadas con asistencia y puntualidad mucho antes de la actividad protegida invocada en este caso.

---

[10] *Véase*, Anejo 1 de la *Réplica a "Oposición a Moción de Sentencia Sumaria, Solicitud de Eliminación de Nuevas y Enmendadas Defensas Tardías, y Solicitud para que se dicte Sentencia a favor de la Querellante* presentada por Metro Caguas, Entrada Núm. 31, SUMAC TPI.

[11] *Véase*, Anejo 2 de la *Réplica a "Oposición a Moción de Sentencia Sumaria, Solicitud de Eliminación de Nuevas y Enmendadas Defensas Tardías, y Solicitud para que se dicte Sentencia a favor de la Querellante* presentada por Metro Caguas, Entrada Núm. 31, SUMAC TPI.

Particularmente significativo resulta que el correo electrónico mediante el cual la señora Rosario le informó al señor Marcial que le había enviado los registros de ponche solicitados de la apelante fue remitido el 1 de marzo de 2024 a las 7:55 a.m.[12], mientras que la comunicación enviada por la apelante relacionada con las deducciones salariales fue enviada ese mismo día a las 5:15 p.m.[13] Así pues, del expediente surge que ya existía un proceso previo de evaluación relacionado con el cumplimiento horario de la apelante y que el supervisor había solicitado información sobre sus registros de asistencia antes de concretarse la terminación del empleo.

Además, surge de la propia deposición de la apelante que esta admitió expresamente que su horario de trabajo era de 10:00 a.m. a 7:00 p.m. En específico, al preguntársele si su horario era de "diez a siete", respondió: "Definitivamente" y luego reiteró: "Mi horario era diez a siete."[14] Igualmente, reconoció que, aunque los registros reflejaban ponches posteriores a la hora requerida, nunca informó al licenciado Marcial ni a la señora Rosario que realmente estaba llegando antes de la hora reflejada en el sistema de ponche. A preguntas sobre ello contestó: "Nunca. Nunca."[15] De igual forma, los registros de asistencia que obran en el expediente reflejan múltiples entradas posteriores a las 10:00 a.m., incluyendo ponches registrados a las 10:15 a.m., 10:16 a.m., 10:20 a.m. y 10:30 a.m., entre otros horarios reflejados en el récord documental del caso.[16]

Lo anterior cobra mayor relevancia al considerar las funciones administrativas y operacionales que desempeñaba la apelante como

---

[12] *Véase*, Anejo 7 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas, Entrada Núm. 20, SUMAC TPI.

[13] *Véase*, Anejo 10 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas, Entrada Núm. 20, SUMAC TPI.

[14] *Véase*, Anejo 2 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas pág. 95, líneas19-22 de la deposición, Entrada Núm. 20, SUMAC TPI.

[15] *Véase*, Anejo 2 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas pág. 96, líneas23-25 y pág. 97, líneas 1-3 de la deposición, Entrada Núm. 20, SUMAC TPI.

[16] *Véase*, Anejo 6 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas, Entrada Núm. 20, SUMAC TPI.

directora de farmacia. Según su propia deposición, sus responsabilidades incluían administrar las operaciones relacionadas con la farmacia clínica del hospital; manejar adquisición, inventario y despacho de medicamentos; supervisar empleados; preparar nómina; mantener comunicación con múltiples departamentos administrativos y clínicos; así como liderar y participar en diversos comités institucionales.[17] En consecuencia, el cumplimiento con el horario de trabajo y la presencia puntual constituían asuntos operacionales legítimos para el patrono, particularmente tratándose de una empleada en periodo probatorio que ocupaba un puesto de supervisión y administración hospitalaria.

En fin, la prueba documental que obra en el expediente demuestra que las preocupaciones patronales relacionadas con puntualidad y cumplimiento horario antecedieron temporalmente a la actividad protegida invocada por la apelante y que dichas preocupaciones fueron discutidas directamente con esta en más de una ocasión. Bajo tales circunstancias, concluimos que Metro Caguas logró articular y sustentar una razón legítima y no discriminatoria para la terminación del empleo.

Por otra parte, contrario a lo planteado por la apelante, el TPI no erró al concluir que no existían controversias materiales de hechos que impidieran la adjudicación sumaria del pleito. Aunque la apelante cuestionó la credibilidad de la declaración jurada del representante patronal y alegó inconsistencias relacionadas con el horario de trabajo, del expediente surge prueba objetiva adicional relacionada con los registros de asistencia y las reuniones sostenidas con la apelante sobre dicho asunto. Más importante aún, las controversias señaladas por la apelante no derrotaban el hecho

---

[17] *Véase*, Anejo 2 de la *Moción de Sentencia Sumaria* presentada por Metro Caguas pág. 71, líneas12-23 de la deposición, Entrada Núm. 20, SUMAC TPI.

medular de que el patrono había comenzado a atender los problemas de asistencia y puntualidad antes de la actividad protegida.

Tampoco persuade el planteamiento de la apelante respecto a que el TPI adjudicó credibilidad indebidamente o aplicó un estándar de preponderancia de la prueba incompatible con la etapa sumaria. Si bien la *Sentencia* apelada utilizó lenguaje relacionado con la "preponderancia de la prueba", al examinar integralmente el dictamen apelado y el expediente ante nuestra consideración, concluimos que la controversia fue resuelta a base de hechos que el TPI entendió incontrovertidos conforme a la prueba documental presentada. Es decir, el resultado no descansó exclusivamente en adjudicaciones de credibilidad sobre testimonios conflictivos, sino en documentos y circunstancias que el TPI determinó no habían sido controvertidos adecuadamente.

Finalmente, tampoco erró el TPI al concluir que la apelante no logró demostrar que la razón articulada por Metro Caguas constituyera un mero pretexto. Aun cuando la apelante señaló alegadas inconsistencias relacionadas con el horario exacto aplicable, la ausencia de manuales o la supuesta falta de amonestaciones formales, ello no fue suficiente para crear una controversia material de hechos respecto a la existencia de preocupaciones patronales previas sobre el cumplimiento horario durante el periodo probatorio. La Ley Núm. 115-1991, *supra,* no impide al patrono tomar acciones disciplinarias legítimas ni exige que este retenga indefinidamente a un empleado probatorio cuando entiende que existen deficiencias relacionadas con el funcionamiento operacional y cumplimiento de normas básicas de asistencia y puntualidad. Así pues, evaluada la totalidad de la prueba documental presentada, concluimos que la apelante no logró presentar evidencia suficiente que permitiera inferir razonablemente que la razón articulada por Metro Caguas para la terminación de su

empleo fue un mero pretexto para encubrir represalias al amparo de la Ley Núm. 115-1991, *supra.*

En vista de todo lo antes expuesto, concluimos que, aunque el TPI debió estructurar expresamente su análisis conforme al esquema probatorio de la Ley Núm. 115-1991, *supra,* dicho error no altera el resultado final del caso. Ello debido a que Metro Caguas logró articular y sustentar una razón legítima y no discriminatoria para la terminación del empleo, y la apelante no presentó evidencia suficiente para demostrar que dicha razón era un mero pretexto. Por tanto, procede confirmar la *Sentencia* apelada.

IV.

Por los fundamentos antes expuestos, ***confirmamos*** el dictamen apelado.

Notifíquese.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones